**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**



FILED BY _____ D.C.

JAN 0 9 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

---

SHIVA AKULA, MD

Plaintiff

v.                                          CIVIL ACTION NO.:

BERNARD CASSIDY, ESQ
PALMETTO GBA, LLC                           CIVIL COMPLAINT
KELLY MELECH ANDERSON
KATIE McHUGH, ESQ.
PASSAGES HOSPICE

---

# Parties

<u>Plaintiff:</u>

SHIVA AKULA, MD – 1750 St. Charles Avenue, 7th Floor #D, New Orleans, LA 70130: 504 669 3825: akulashiva12@gmail.com

<u>Defendants:</u>

1. BERNARD CASSIDY, ESQ – 1 E Broward Blvd, Fort Lauderdale, FL 33301 -
bmc@lubellrosen.com
1. PALMETTO GBA, LLC – 17 Technology Circle, Columbia, South Carolina 29203: 803 735 1034
2. KELLY MELECH ANDERSON – 256 Highland Oaks N, Madisonville, LA 70447-3122
3. KATIE McHUGH, ESQ – 650 Poydras Street, Suite 1600, New Orleans, LA 70130
4. PASSAGES HOSPICE – 617 Dublin Street, New Orleans, LA 70118

# Jurisdiction + Venue

**1. Jurisdiction:**

General:

28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of his Constitutional rights and U.S.C. § 1964(a)(b)(c)(d) and 1962.

U.S.C. § 337 – Plaintiff's allegations allege violations of an Act of Congress regulating commerce and monopolies.

28 U.S.C. § 1332(d)(2)(A) – Plaintiff is a citizen of a different state to the lead Defendant and the aggregate amount in controversy exceeds seventy-five thousand dollars ($75,000).

Personal:

The Court has personal jurisdiction over all Defendants, as each Defendant has transacted business, maintained substantial contacts, and/or committed acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including this District. This Court also has personal jurisdiction over all Defendants pursuant to Fed. Civ. P. 4(k)(1)(A) because they would be subject to a court of general jurisdiction in Florida.

**2. Venue:**

28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## Preliminary Statement

3. This case, in which Plaintiff Akula seeks compensatory, consequential, and punitive damages, further exposes a conspiracy perpetrated by the insurance industry against ethnic minority physicians, a conspiracy that has intensified since the 2012 HFPP, a pact in which the insurance industry assumed control of the investigative, prosecutorial, and adjudicative elements of government. The Defendants have illegally controlled and directed these powers against Plaintiff Akula and his business holdings, in order to eradicate their debt to him and the competition he presented to their commercial interests in the hospice care market. In the perpetration of this fraudulent scheme, the Defendants, acting under the 'color of law', and in full knowledge of the scheme's illegality, continue to violate Plaintiff Akula's human and constitutional rights, for which he now seeks compensation.

# Statement of Fact

**Canon Healthcare:**

4. From 2000 Canon successfully provided hospice healthcare services to hundreds of thousands of Louisiana patients. It is a Joint Commission Accredited facility. JCAHO is the seal of best quality of care which most hospices do not have.

5. By 2013, Canon employed approximately over 200 persons, that included doctors, nurses, ancillary medical staff. The administrative staff oversaw the day-day operations of Canon. Ochsner physicians under contract provided 24/7 coverage for hospice care.

6. Plaintiff Akula is a clinically active infectious diseases specialist, whose time is principally absorbed with treating infectious disease patients, and who delegates the day-to-day operations to his almost two hundred (200) person staff.

7. Plaintiff Akula first became Medicare certified in 2000, and has provided care, without incident, to thousands of Medicare patients.

8. In the time period from 2013 to 2017, Canon Healthcare underwent several internal and external audits that assessed its compliance with Medicare rules and regulations, in which Canon, its employees and Plaintiff Akula were found to be in full compliance.

9. Plaintiff Akula, in ensuring Canon remained in compliance, did employ, amongst other things, an electronic medical records system, that was utilized by the healthcare providers delivering care, in order to generate records that accurately reflected the patients' medical conditions and subsequent treatment plans.

10. The physicians that entered the data into the medical records system were contracted from the Oschner Health Care System, but were all independently licensed, with no commercial or business connection to Plaintiff Akula.

11. These medical records provided the basis on which individuals specialized in medical billing completed and dispatched invoices to Medicare. The accuracy of the invoices was verified with the clinical data entered by the Oschner physicians, and this clinical data was derived from the taking of patient histories, examinations and test interpretations directly conducted by the Oschner physicians, a process in which Plaintiff Akula had absolutely no participation.

12. The Oschner physicians rendered treatment decisions based on the standards of good medical practice and the best interests of the patients, and these facts were reflected in the decades-long excellent care outcomes associated with Canon Hospice.

13. None of the Oschner physicians were ever sued or subjected to any regulatory action during their involvement with Canon hospice.

14. When medically necessary and only if in the patients' best interests, the Oschner physicians would amend the patient's treatment plans to increase the level of care, to ensure that upon discharge their condition had been optimized and the risk of readmission and or sudden death minimized.

15. The care ordered by the Oschner physicians, as documented in the patients' files, was based on the evidence obtained from the patient's history, examination and any investigative studies, and the recommendations of care were consistent with these findings.

16. Similarly, the Oschner physicians' determination that a patient was terminally ill, was based on the probability standards widely accepted in the medical literature, and it was from a consideration of these standards that care plans were implemented. The certifications and re-certifications were signed only by the Oschner physicians.

17. Within the Canon Hospice program regarding terminal illness, there existed plan of care protocols that complied with widely accepted standards of care regarding the palliation of terminal conditions.

18. Patients were referred to the Cannon Hospice through several different avenues, that included other physicians, family members and the facility's reputation within the community, and staff implemented a standardized intake protocol in which patients were advised of their right to receive Medicare funded hospice care for a limited period.

19. The Cannon Hospice staff would spend approximately --- minutes at intake, answering patients' questions, explaining their options, and indicating that if they chose to receive care at the Canon Hospice, they would need to submit an election statement.

20. The patients admitted to Canon Hospice were fully informed of their privileges and rights, and signed the election forms after a comprehensive consent process, in which they were educated as to what services Medicare would cover.

21. It was the custom and practice of Canon Hospice that the Oschner physicians certified patients as being terminal, and did so based on an application of the patient's clinical evidence and prevailing standards within hospice care.

22. The necessary terminal illness certifications of the Oschner physicians were filed in the patients' charts, and submitted to Medicare in support of the billing process, and were relied upon by Medicare in their determination to pay Canon Hospice.
These certifications complied with Medicare regulations and included information pertaining to prognosis, clinical findings, and the period in for which the benefits are sought.

23. In those instances, particularly after Hurricane Katrina in which Medicare reneged on promises to reimburse Canon Hospice for providing care that saved many lives, Cannon Hospice prevailed in legal appeals, that resulted in a compensation order to Canon Hospice of almost $800,000.

24. The lawyer who won this award was subsequently harassed and threatened by the Medicare contractor into abandoning Plaintiff Akula and Canon Hospice, a tactic that Plaintiff Akula has come to know is typical of the insurance industry's attacks on physicians to whom they owe money.

7

25. It was the practice of the Oschner physicians and Canon Staff nurse practitioners to conduct periodic face-to-face evaluations with all terminally ill patients, in order to satisfy the standards necessary to certify the patients for medically necessary ongoing care, and or to terminate hospice care.

26. It was the practice of the Oschner physicians, Canon Staff nurse practitioners and administrative staff to inform Medicare in writing, when hospice services had been terminated patients who died, were discharged and, were no longer deemed terminal and or self-revoked their hospice benefits.

27. It was the practice of the treating Oschner physicians to order care plans that satisfied the medical and other social requirements of the patient and his or her family, recognizing that the optimal delivery of home hospice care required the participation of family members.

28. The Oschner physicians periodically reviewed and amended, if necessary, these care plans, to reflect any conditions requiring either an increase or decrease in the level of care.

29. The Oschner physicians periodically convened to review and amend, if necessary, the policies governing the development of care plans.

30. The principal billing codes utilized by the billing service were CPT Code 99233/99236/99350, and every invoice submitted to insurance companies was supported by clinical notes that contained the elements required for each billing code.

31. At no point in time in the history of the Cannon Hospice was there ever an independent billing audit that identified any fraud, nor any suggested correction that was not remediated.

32. At no point in time in the history of the Canon Hospice did Medicare ever refuse to reimburse services based on allegations of fraud.

8

**The Conspiracy and Indictment:**

33. On August 5, 2021, the Plaintiff was federally indicted on charges that he allegedly submitted fraudulent bills to Medicare, as part of a grand scheme, purposed to enrich himself.

34. The indictment and subsequent prosecution were a consequence of a conspiracy concocted by Defendants Passages, Anderson, and co-conspirator William Cassidy, Esq, all of whom stood to profit at the expense of Plaintiff Akula, through respectively, increased market share by eliminating Akula and seizing his business assets, a 'whistleblower' fee, and legal fees for Plaintiff Akula's criminal defense.

35.The Defendants co-conspirators included the third-party Medicare contractor, which stood to profit from withholding fees for legitimately rendered patient care services and filing knowingly false forfeiture claims that sought to effectively 'rob' Plaintiff Akula of his legally obtained assets, and render him unable to mount a legal defense and or simply survive.

36.The elements of this conspiracy have been codified in various government-insurance industry pamphlets and 'playbooks' under the guise of a secret agreement entered into by the insurance industry and certain governmental agencies, in or about 2010/2012.

37. The tactics employed against Plaintiff Akula have been employed, since at least 2012, against many other successful and innocent Indian physicians, most of whom remain incarcerated in American jails.

38. These tactics include a corruption of the targeted physician's attorney, purposed to 'convert' the lawyer into an agent of the insurance-governmental industrial complex, who is bribed into conspiring against his client by sabotaging the case from within.

39. The tactics also include ensuring the case is assigned to a corrupted judge, who is on the insurance industry's 'payroll', a tactic that further bolsters the likelihood of a preordained

conviction. Co-conspirator Cassidy in turn sought the favor of Judge Africk to help keep $250,000 without even obtaining discovery. Co-conspirator Cassidy's subsequent motion of withdrawal was sent to Judge Africk with mention of NON-REFUNDABLE DEPOSIT. The language was changed in a later submission when he knew Judge Africk would not be hearing the motion.

40. The Defendants and their co-conspirators commandeered the investigative, prosecutorial, and judicial apparatus of the state, in the conception, concoction, initiation and execution of the arrest and indictment of Plaintiff Akula, in order to advance their own economic and political agendas, an element of which includes a policy of the racial cleansing from their community of Indian physicians.

41. The Defendants scheme included the drafting and filing on August 5, 2021, in the United States District Court of a knowingly fraudulent indictment, that describes a purported scheme, ("AKULA SCHEME") in which Plaintiff Akula is alleged, singlehandedly, to have submitted false invoices to the insurance industry, in a multi-year racket.

42. The alleged "AKULA SCHEME" is pled without evidence, and or with the false testimony of the Defendants, whose interests were furthered with the indictment of Plaintiff Akula.

43. It is a tactic detailed within the 'playbook' of the insurance-government industrial complex, to bribe or threaten the family, friends, acquaintances, patients and or employees of targeted physicians, into providing false sworn testimony against them.

44. The August 5, 2021 'indictment' is the product of the Defendants and their co-conspirators commission of a prolonged series of criminal acts of fraud, bribery, and public corruption, and is a document which contains knowingly false accusations.

45. The Defendants/co-conspirators allege that Plaintiff Akula attempted to defraud Medicare contractors by submitting bills for medically unnecessary care, while knowing that the care was

indeed necessary, as evidenced by the unrefuted clinical notes submitted in support of the invoices.

46. The Defendants/co-conspirators, in abusing the legal system to file an anti-competitive sham indictment, allege that Plaintiff Akula attempted to defraud Medicare contractors by causing employees to improperly admit patients and to then submit bills for services at the GIP rates, while knowing that the patient's clinical condition, as evidenced in the clinical notes, substantiated the care plan.

47. The Defendants/co-conspirators, in their fraudulent indictment, fail to include any evidence from patients to support their knowingly false allegation that patients were admitted without good medical cause, and that the billing associated with care plans was without evidential foundation.

48. The Defendants/co-conspirators falsely allege that Plaintiff Akula attempted to defraud Medicare contractors by simultaneously submitting bills for CPT Code 99233, while receiving the daily per diem rate, while knowing that in these instances, there existed a clinically substantiated cause for the billing.

49. The Defendants/co-conspirators falsely allege that Plaintiff Akula attempted to defraud Medicare contractors by routinely submitting bills for CPT Code 99236 for patients admitted into hospice care level GIP, and who remained on GIP for more than 24 hours, while knowing that the instances of this billing detail occurred with a rarity attributable to the billing industry accepted standard of harmless error.

50. The Defendants/co-conspirators falsely allege that Plaintiff Akula attempted to defraud Medicare contractors by separately billing on 24,053 instances, for CPT Codes 99233 and 99236, the reimbursement of which was included in the Medicare per diem rates for the GIP services, while knowing that the submitted billing forms do not support their allegation.

51. The Defendants/co-conspirators falsely allege that Plaintiff Akula attempted to defraud Medicare contractors by billing, on 1,949 separate instances, for CPT Code 99350, while knowing that there exists no evidence which supports their claim that on 1,949 instances, none of the Oschner physicians rendered the home visit service.

52. The Defendants/co-conspirators, in basing the 23-count indictment on the files of only 6 patients, while knowing that hundreds of thousands of patients had been successfully cared for at the Canon Hospice since its inception in 2003, did knowingly mischaracterize the facts in a gross manner, to support the indictment, the principal purpose of which was to illegally eliminate Plaintiff Akula, an Indian physician, from the hospice care market, and seize his assets.

**Facts relevant to Defendants:**

53. Plaintiff Akula, through the Canon Hospice Organization, did, in a period commencing in 2005 with the onset of Hurricanes Katrina and Rita, provide life-saving hospice care to thousands of elderly and infirm residents of Louisiana, with the consent of Medicare.

54. These life-saving services cost money, and consequently caused the generation of invoices to Medicare, a large percentage of which remain improperly unpaid, in approximately the amount of sixteen million ($16,000,000).

55. Plaintiff Akula, in attempting to have these invoices paid, did seek the assistance of lawyers and physician advocate group, Physicians Against Abuse, and in 2013, after several years of intense litigation, did win an appeal in which Medicare was forced to reimburse Dr. Akula 704, 881.58.

56. Almost immediately after Dr. Akula's receipt of the money, there did commence a vicious campaign of harassment and intimidation of Dr. Akula, his family and close acquaintances, that

12

involved organized-crime syndicate like tactics of threatening texts and use of the US wires in the dissemination of highly defamatory propaganda about Dr. Akula, that included threats against his life, liberty, and property.

58. The purpose of this campaign was to isolate Dr. Akula to ostracize Dr. Akula socially and economically, in order to render him unable to defend against the subsequent criminal charges, and cause him to plead guilty. This is the typical 'playbook' of the insurance industry, the entity which orchestrated the campaign against Dr. Akula.

59. The private insurance industry is highly invested in Medicare, which it controls, along with the investigative, prosecutorial, and adjudicative elements of state and federal governments.

60. In the period from 2013, after Medicare paid Dr. Akula, to the present, the conspiracy to have him eradicated from the American medical market through incarceration, has expanded to involve all the Defendants, who have commercially benefitted from increased patient referrals since their conspiracy caused degradation of Dr. Akula's healthcare business.

61. Since the 2013 commencement of the conspiracy, the Defendants have conspired to harass and intimidate Dr. Akula's lawyers, many of whom have abandoned him, and caused him to be deprived of his constitutionally protected right to counsel.

62. In late 2021/2022, Defendant McHugh did attempt to engage a federal judge in a series of exparte communications, purposed to have the court enter orders denying Dr. Akula the services of physician advocacy group, Physicians Against Abuse.

63. Defendant McHugh recognized that PAA had identified the conspiracy and **"pattern"** conducted by the insurance industry and governmental agencies, in which it targeted successful ethnic minority physicians for civil and criminal prosecution, in order to eradicate the monies, they owed these physicians for properly rendered clinical services.

13

64. Defendant McHugh sought, through these exparte communications, to illegally restrict and or prevent Dr. Akula from identifying and presenting to a jury, facts pertaining to this corporate-government conspiracy.

65. Defendant McHugh recognized the immense exposure to the conspirators and their co-conspirators of a public exposure of schemes of racial discrimination, involving mass incarceration programs of principally Indian and African American physicians.

66. Defendant McHugh's tampering with the process of justice in this case was a continuation of a course of felonious conduct in which she had willingly participated for many years, and in cases that resulted in the wrongful conviction and incarceration of innocent ethnic minority physicians.

67. Dr. Akula's decision to fight the indictment, and not plead to Defendant McHugh's knowingly false charges, caused Defendant McHugh to recuse herself from the case, consequent to her recognition of the risks to her professional career and liberty.

68. Defendant Passages, a long-time market competitor of Dr. Akula, was a principal perpetrator of the conspiracy against Dr. Akula, and participated in hundreds of communications with persons associated with the insurance industry and governmental agencies, in which their common purpose was the manufacturing of a scheme to have Dr. Akula illegally eliminated from the American healthcare market.

69. The stress caused to Dr. Akula consequent to the Defendants conspiracy, caused him to require an emergency life-saving cardiac procedure in 2018. It has been the **"pattern"** of the insurance-governmental industrial complex to engineer schemes that attempt to eliminate them by, amongst other things, incarceration, economic destruction and or death from suicide, cancer, or cardiac complications.

70. The Defendants harassment continues till this today, with arbitrary, unsubstantiated, and unrelenting chart audits, that are purposed to isolate and economically deplete Dr. Akula, with the expectation that if and when his indictment comes to trial, he will either plead guilty or be financially unable to retain legal counsel. This is a common element of the many almost identical schemes perpetrated by against ethnic minority physicians in America by the insurance industry.

71. In approximately 2018, Defendant McHugh in conspiracy with my then attorney, William Barzee, attempted to have me plead guilty with the promise of probation or a few years in jail, and in attempting to persuade my lawyer, Defendant McHugh allegedly showed him a document purported to be an affidavit from 'whistle blower' ex-employee, Defendant Anderson. I did not plead to Defendant McHugh's false charges.

72. Commencing in or around 2018, Anderson started sending me texts that my company would be forced to file for bankruptcy, and it subsequently was brought to my attention that Anderson was being 'fed' this false information from her communications with Defendant McHugh, for the purpose of causing Anderson to abandon me and to cause a dissemination into my local community of highly prejudicial information, to have me ostracized.

73. Anderson is now employed by Defendant Passages, which continues to disseminate falsehoods purposed to hinder the construction of Canon's in-patient facility in Covington, Louisiana.

74. At some time after 2018, the owner of Defendant Passages entered into a conspiracy with my ex-wife, in which during multiple meetings, he sought to have my ex-wife fabricate evidence that he believed would cause me to be convicted and jailed. During these meetings he offered monetary bribes to my ex-wife, in exchange for her lies. To my knowledge she refused, but continues to be harassed by Defendant McHugh.

75. In 2021, my mother died. She had lived in the US, but returned to India. However, during her time in the US, she volunteered at the Canon Hospice. It is an extremely important tradition within Indian culture that the eldest child administers the final death rights, in order that the soul of the departed rest in a state of peace. Defendant McHugh caused this right to be denied to me, my family, and my mother, by lying to the Court that Indian physicians who relocated to India had failed to return, and that I had fabricated my mother's cremation certificate, a document issued under the authority of the Indian Government.

76. It was the intent of the Defendants to cause me to be subjected to immense shame by my family, in order to have my family ostracize me, in the belief, albeit mistaken, that if and when the case went to trial, I would be so psychologically weakened as to not want to fight the case.

77. In 1994, I established the Akula Foundation as a means of using my resources to assist my community outside of my medical practice, and commencing in approximately 2020, the foundation assisted in COVID related vaccination programs in poverty-stricken areas, the laudatory comments of which made by local, state, and federal government officials, undermine the 'character-assassination' type comments contained within the indictment.

78. The Defendants have harassed this foundation with improper subpoenas, the purpose of which is to destroy any entities associated with my name, in the belief that it will cause me to plead to Defendant McHugh's false charges and not fight the case. As a consequence of these harassing subpoenas, approximately $31,000 of my money remains illegally held by Capital One Bank.

79. Subsequent to my indictment on August 5, 2021, Defendant McHugh has provided no evidence to substantiate the charges, and has violated my right to discovery, because she knows there is no credible evidence underpinning her knowingly false charges.

80. The unsubstantiated indictment caused immense harm to my reputation, in that I lost all of my admitting privileges and contracts with insurance companies.

81. The illegal loss of these rights and privileges was orchestrated by the insurance industry, in an attempt to undermine my ability to fight the criminal case, and constitutes an element of a far-wider conspiracy between the insurance industry and the American Government, against Indian and African American physicians.

82. Defendant McHugh, through multiple exparte communications, tampered with judicial function to have Judge Roby reverse her decision to permit PAA to collaborate with my lawyer, in furtherance of my defense. The purpose of this was to cause me to become further isolated, and plead guilty to Defendant McHugh's false charges.

83. The basis of Defendant McHugh's knowingly false charges pertains to an alleged over-payment by Medicare of fifteen invoices of approximately one hundred and two dollars ($102) each. These types of grossly unjust charges have never been brought against white American trained physicians, and are directed in the most discriminating manner against ethnic minority physicians and foreign medical graduates.

84. Shortly after I was charged, and at the first detention hearing, Defendant McHugh lied to the Court that a relative of mine had allegedly left the country, and that therefore I too was a flight risk, and as a consequence of this lie, I was almost jailed.

85. Subsequent to the filing of the indictment, many banks with which I had conducted business for many years, closed my accounts in furtherance of the Defendants conspiracy to undermine my ability to survive and ultimately to fight the case. This particular tactic, as I have since come to know, is part of the 'playbook' of the insurance-government industrial complex.

86. Approximately three (3) years prior to the indictment, and evidence of Defendant Anderson's complicity in the scheme, she began aggressively demanding unreasonable wage

increases, in a manner never previously done. Dr. Akula noted a distinct, and hostile change in her demeanor, consistent with her knowledge that she was conspiring against Dr. Akula

87. Defendant Anderson felt emboldened because she believed her participation in the Defendants conspiracy was crucial to their case to indict and convict her former long-time employer Dr. Akula, with the promise of an alleged 'whistleblower pay day'. Anderson and her husband were desperate for money and saw Dr. Akula as a rich 'easy target', and so fabricated evidence that was used to have a grand jury issue an indictment.

88. Dr. Akula asserts that the indictment was procured through fraud, is fraudulent and that this illegal tactic has been widely used by the insurance-government industrial complex in the prosecution and incarceration of many innocent ethnic minority and Indian physicians.

89. Defendant Anderson continues to conspire with Defendants McHugh and or her replacement, and has promised, in return for receiving bribes and job with Dr. Akula's competitor, Defendant Passages, to provide false testimony if the criminal case is tried, in order to attempt to have Dr. Akula convicted, his assets seized.

90. Defendant McHugh submitted knowingly false information in the drafting of her indictment, that included claims that I had overseen all daily activities within the Canon Hospice. The falsity of these claims was exposed in an order issued by Judge Roby. As I have come to know it is the **"pattern"** of dishonest prosecutors to lie to the court, in the belief that neither the Defendant nor his lawyer, who has often been corrupted by the insurance industry-government industrial complex, will identify and or object to the falsehoods.

91. Defendant Cassidy, having been retained by Plaintiff Akula in the criminal matter, did demand and receive from Plaintiff Akula, an amount of $250,000, based on representations that he and his firm would provide a legal defense. This was a false representation.

92. In the entirety of Defendant Cassidy's representation of Plaintiff Akula, neither he nor his firm, despite repeated requests from Plaintiff Akula, have provided any documentation to substantiate the existence of any preparation of any legal defense, or indeed any work.

93. Defendant Cassidy has, on multiple occasions, misrepresented to Plaintiff Akula that a work product would be provided in the form of 'bankers boxes', but none were ever provided.

94. In December 2022, Plaintiff Akula informed Defendant Cassidy that if, by a certain date, he was not provided the requested information, he would initiate a bar complaint and civil action, and in response, Defendant Cassidy, instead of providing the information, filed a motion to be released from the case.

95. Defendant Cassidy's fraudulent representations and theft of Plaintiff Akula's monies were perpetrated as part of the Defendants over-arching scheme to violate Plaintiff Akula's human and constitutional rights to due process, and to cause his illegal incarceration and seizure of assets.

96. I have come to know that the arm of American jurisprudence purposed to administer civil and criminal matters involving corporations and or state agencies, does operate in a profoundly corrupt manner, that causes mass violations of the human and constitutional rights of non-corporate litigants.

97. I have also come to know that pleas to the American government to investigate and prosecute corporations is almost non-existent, and I believe this is because American corporations have essentially 'purchased' the American government, through grand schemes of political and judicial corruption.

## Legal Claims

## RICO
## U.S.C. § 1964(a)(b)(c)(d) and 1962.

Against Defendants Passages/Anderson/Palmetto GBA/McHugh/Cassidy

All of the preceding paragraphs are incorporated within.

98. In a period commencing in approximately 2010, the Defendants did conspire to commit and did commit a pattern of racketeering, through the knowingly illegal commission of a series of RICO predicate acts, that included, but were not limited to mail fraud, bribery, conspiracy, and public corruption, in which with criminal intent, they converted the judicial and prosecutorial apparatus of the American Government into an association-in-fact racketeering enterprise, for the purpose of profiteering at the expense of the life and liberty of Plaintiff Akula.

99. In the planning and perpetration of this racketeering scheme, the Defendants, motivated by greed, employed the US wires, and conducted face-to-face meetings, in a knowingly illegal manner, to transmit and exchange information regarding the construction, structure and operation and final purpose of the scheme, that being the incarceration of Plaintiff Akula.

**The Communications**:

100. Commencing in approximately 2010, and as a direct consequence of Plaintiff Akula's almost $800,000 judgment against Defendant MC, this Defendant decided to retaliate against Plaintiff Akula, and so entered into a series of discussions with the other Defendants, the substance of which is pled below:

101. **Palmetto GBA – McHugh**: Defendant MC, in seeking to recoup, albeit illegally, their loss, directly contacted Defendant McHugh, and instructed her to commence an investigation against Plaintiff Akula and convene a grand jury to indict Plaintiff Akula. Defendant McHugh

understood and expressed to Defendant MC that there existed no legitimate basis on which to indict, but was instructed to cause Plaintiff Akula's staff, and particularly Defendant Anderson to provide false testimony that Plaintiff Akula had committed insurance fraud. Defendant MC advised Defendant McHugh that it would, in furtherance of the scheme, funnel bribes to Defendant Anderson, and that Defendant Passages had promised Defendant Anderson a higher paying job, on the condition that she assisted in persuading Plaintiff Akula's patients to have their care and benefits transferred to Defendant Passages. Defendant McHugh consented to participating in this scheme, convinced that it would never be exposed by Plaintiff Akula, as she indicated to Defendant MC that she would conspire against Plaintiff Akula with whichever lawyers he retained.

102. **Palmetto GBA-Anderson**: In orchestrating the scheme, Defendant MC used the US wires and face-to-face meetings with Defendant Anderson, for the purpose of entering into a series of quid pro quo schemes, in which Defendant Anderson received bribes in exchange for providing to Defendant McHugh, knowingly false testimony that Plaintiff Akula had committed insurance fraud. Defendant MC requested Defendant Anderson provide to itself and Defendant McHugh, copies of Canon Hospice patient files. Defendant Anderson willingly and with knowledge of its illegality, entered into this conspiracy and provided knowingly false testimony and copies of patient files, in knowing violation of these patients HIPPA rights and bypassing the attorney representing Canon.

103. **Passages-Anderson**: Defendant Passages, in seeking to illegally seize Plaintiff Akula's business, coopted, and conspired with Defendant Anderson in the perpetration of a quid pro quo scheme, in which they promised Defendant Anderson a higher paying job, in return for her providing them the contact information of Canon Hospice patients, and for her assistance in persuading these patients to transfer their care and benefits to Defendant Passages. In perpetuating this scheme, Defendants Passages and Anderson knew of its illegality, but calculated that their wrongdoing would never be exposed by Plaintiff Akula, as he simply would not be able to conceive of the conspiracy, and that even if he did, his lawyers would dissuade

and or threaten him into not taking any action. In fact, Defendant Passages subsequently informed Defendant Anderson that Plaintiff Akula's lawyers had instilled fear in Plaintiff Akula by saying that the judge was an ex-prosecutor, who would **"chop off"** his head if he did **"not follow their orders"**. Defendant Anderson, at certain points in time, expressed concern as to whether she would go to jail if their scheme was exposed, to which Defendant Passages responded that the scheme would never be exposed, as Plaintiff Akula had become extremely fearful and was controlled by his lawyers.

**The RICO Predicate Acts**:

104. **Mail Fraud**: The Defendants did, with knowing illegality, use the US wires on hundreds of occasions, to perpetrate, propagate and perpetuate their fraudulent scheme that Plaintiff Akula had committed insurance fraud. The specific purpose of this scheme was to erdicate Defendant Medicare contractor's debt to Plaintiff Akula and to eliminate the competitive threat posed to Defendant Passages' business by Plaintiff Akula. The Defendants criminal scheme was perpetrated to conclusion with the illegally procured indictment of Plaintiff Akula, an indictment secured through the provision of false grand jury testimony. The Defendants did, with knowing illegality, use, with its implicit consent, the judicial apparatus of the state to perpetrate their scheme, in having the criminal case improperly steered towards a judge who has been corrupted by the insurance industry, and in doing so, did further violate Plaintiff Akula's human rights.

105. **Bribery**: Defendants Passages and MC, in seeking to ensure the conviction and incarceration of Plaintiff Akula, and in not wanting to permit any opportunity for justice, did, through intermediate agents, enter into a quid pro quo scheme with U.S.D.J. Lance Africk, in which bribes were funneled into his financial accounts and those associated with members of his family, in return for his manipulation of the case to cause a conviction of Plaintiff Akula. It is asserted that U.S.D.J. Africk will be compelled to disclose his financial holdings, subsequent to petitions to the United States Supreme Court, the Judicial Disciplinary Council for the 5th Circuit

and the Senate Judiciary Committee, and that this disclosure will provide further specificity as to the financial element of the Defendants' crimes. The Defendants stood confident in this scheme, as it was part of a pattern that had been successfully executed against numerous other ethnic minority physicians, in the court of U.S.D.J. Africk.

# ANTITRUST
## Sherman/Clayton

Against Defendants Passages/Anderson/Palmetto GBA

106. All of the preceding paragraphs are incorporated within.


107. **The Hospice Care Market**: The defined market is that involving the provision, within the State of Louisiana, of hospice care services to members of the public with medical conditions that require palliative care delivered in both the inpatient and home settings.


The demand for hospice care services in Louisiana far exceeds the supply, and the loss of a provider detrimentally affects patients in need of such life-saving care.


108. **The Anti-Trust Scheme**: The Defendants, did, in a time period beginning in approximately 2007, commence conspiring to commit per se antitrust violations, and did commit such violations, with the knowing purpose of having Plaintiff Akula illegally eliminated from the Louisiana hospice care market, in order to increase Defendant Passages market share. The scheme of per se violations was conducted over a period of years, and involved, amongst other things, the felonies of bribery, public corruption, wire fraud and false arrest and imprisonment. Specifically, Defendants MC and Passages, both being competitors of Plaintiff Akula within the finite health premium based financial pool, illegally coopted and coerced governmental investigative, prosecutorial, and judicial agencies to file knowingly false charges against Plaintiff Akula and his businesses. The overall structure of this scheme was well established, as the 'blueprint' had been set out in approximately 2012 with the Health Fraud and Protection Partnership (HFPP), a quid pro quo type agreement entered into by the insurance industry and government, in which the insurance industry, in return for funneling bribes to politicians, were provided massive tax reductions and control of the investigative, prosecutorial and judicial arms of government, that they then used, with the government's consent and participation, to indict convict and incarcerate innocent physicians, to whom they owed money. The scheme against Plaintiff Akula was orchestrated by Defendant MC, and conducted in collusion with Defendants

24

Passages and Anderson, who all knew the scheme was not only anti-competitive, but violative of Plaintiff Akula's human and constitutional rights. The scheme did cause immense injury to Plaintiff Akula's reputation, financial standing, and health, and in 2017, he required an emergent cardiac ablation at the Mayo Clinic to save his life. The Defendants per se violations have caused injury to the Louisiana public, in artificially, and not because of a superior product, restricting the hospice care market.

# SECTION 1983

Against Defendants Passages/Anderson/Palmetto GBA/McHugh

109. All of the preceding paragraphs are incorporated within.

110. The nexus of joint action between the Defendants, and the application of 'state actor' tests, such as 'pervasive entwinement', do indeed confirm that Defendants MC, Passages, and Anderson did act under the color of law in the conception, development and perpetration of their RICO and anti-trust schemes. The Defendants perpetrated the schemes, in full knowledge of and with the express intent of violating the civil rights of Plaintiff Akula, an individual who was targeted because of his Indian heritage. The specific constitutional rights that were violated, include those enshrined in the 4th, 5th, 8th. 13th and 14th amendments. Defendants MC, Passages, and Anderson's coopting of the investigative, prosecutorial, and adjudicative functions of state commenced in approximately 2007, and continued with the assignment of the case to U.S.D.J. Lance Africk, a jurist who has received, and receives monies and other tangible benefits from Defendants MC and Passages. In this ongoing pattern of corruption, the injury to Plaintiff Akula's rights has continued to increase in an exponential manner, with a material threat to his most basic right, that of liberty, and of not being subjected to the vicissitudes of indentured servitude, which is what these deprivations, in conjunction with the dedication of his life to medicine, would constitute. The Defendants are continuing in their scheme to rob Plaintiff Akula of the 'fruits' of his decades-long labor, a scheme that is being perpetrated through and under cover of the investigative, prosecutorial, and adjudicative branches of state. The Defendants have converted the constitutionally designed elements of state, a design born from the colonialist's bloody war against the tyranny of the British Empire, and returned the state to that condition of tyranny, as if there had been no war of independence.

## RELIEF

Plaintiff Akula seeks compensatory, consequential, and punitive damages against the Defendants, in the amount to be decided through either settlement of a jury trial.

I certify that the above statements are true and accurate to the best of my knowledge and that if it is proved that I knowingly and willfully misrepresented the above facts, then I will be subject to punishment.

Date: January 6, 2023

SHIVA AKULA, MD

28

ORIGIN ID:NEW
SHIVA KAPAH R

1750 ST CHARL

NEW ORLEANS,
UNITED STATES

TO US DIST
SOUTH
400 N M

MIAMI

(000) 000-000

TRK# 39

XG

RT **458**   1     **E**
FZ **459**   10:30
4219
01.09